UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

S.W., by her parent and natural guardian, J.W.,
individually and on behalf of all others similarly
situated; A.W., by her parent and natural guardian
A.W., individually and on behalf of all others similarly
individually and on behalf of all others similarly
situated; J.F. and P. F., by their parent and natural
guardian, A.F., individually and on behalf of all others
similarly situated; L.T., by her parent and natural
guardian, R.T., individually and on behalf of all
others similarly situated,

                              Plaintiffs,

vs.

SHEILA WARREN, sued individually, and as
Director of Early Intervention Services for Orange County,
ORANGE COUNTY DEPARTMENT OF HEALTH,
COUNTY OF ORANGE,

                              Defendants.

Civ. Action No. 07 CIV 5708 (WCC)

**AFFIDAVIT**

---

STATE OF NEW YORK  )
                           ) ss:
COUNTY OF ORANGE   )

ANNMARIE FLYNN, being of full age, deposes and says:

1. I am the parent and natural guardian of my sons, P.F. and J.F., plaintiffs herein.

2. In June 2006, my 19-month old sons, J.F and P.F., were evaluated and approved for speech therapy through Early Intervention. After the evaluation, the evaluator told us that our sons would "probably" be getting speech therapy twice a week.

3. In August 2006, the speech therapist first came to our home. I asked her how many therapy sessions each of my sons would be receiving. She stated that they would each receive one session per week. I told her that the evaluator had mentioned that they would receive the therapy twice a week. She looked at the report and told me that it had been written up for just one session for each of my sons.

4. In September 2006, my husband and I expressed our concern to our son's speech therapist, Caroline, that our sons did not appear to be making progress. Caroline said she would speak with Vanessa, the ongoing service coordinator at the time. Caroline did speak with Vanessa, and reported to us that Vanessa said she would discuss with Jennifer, the EI representative.

5. For approximately 2 weeks, we heard nothing from either Vanessa or Jennifer. Finally, in mid-October 2006, Vanessa called and told me that she had left several messages for Jennifer, who had not returned any of her calls. She suggested that perhaps Jennifer would respond more quickly to a call from a parent. I then called Jennifer, but could not leave a message because her mailbox was full. I left a message on another employee's voicemail and, finally, Jennifer called our home and spoke with my husband.

6. Jennifer told my husband that we were not doing speech sessions correctly and that it was supposed to be two sessions per week, each child sitting in

on the other child's speech session. I told that to Carol, the speech therapist, and she said that is not correct.

7. I then called Jennifer back and told her what Carol had said. Jennifer stated that "EI is a family-based model" and that the children should be sitting in on each other's sessions. She went on to explain that, basically, it was supposed to be Caroline working with John and one of the parents working with Patrick. The parent was to be imitating with Patrick what Caroline was doing with John. I told her I didn't agree with that; it had never been explained that way by any of the team members.

8. Jennifer then told me that there was a shortage of speech therapists and to give a second session to each of my sons would require away services from a child who wasn't receiving any services.

9. At one point, Jennifer told me that the reason "her way" wasn't working was because I had gone back to work and just my husband was home during the day. She stated that, before I had gone back to work, the program was working just fine. In addition to being insulting to me, this wasn't even true. She insisted that we attempt to work it as a "family model" and that whichever parent was home would sit in the session and work with one child while Caroline worked with the other, for a period of 45 minutes, which would constitute one session; then they would switch children for the next 45 minute session, resulting in the children having to sit for an hour and a half in high chairs while being given instruction.

10. This went on through December 2006. We then attended our first team meeting and my husband and I requested that each of our children receive an increase in therapy to twice a week, individually. Between October and December, I phoned Jennifer and told her that this was not working. She agreed to a second 45 minute session to be shared by the boys, but stated it would only be written up for Patrick. She said that we did not need to participate in this session, but only watch while Caroline provided simultaneous therapy to both boys. She stated we would have to continue with the 1.5 hour session, alternating between both our sons.

11. We agreed to this over the telephone, and the second shared session commenced before we received the written amendment.

12. When we met in December 2006 for their 6-month review, Jennifer claimed that there was a lack of speech therapists in Orange County. However, with both my husband and I insisting that our children be provided the opportunity to progress, and with the vocalized support of Caroline and Vanessa, Jennifer finally relented and agreed to allow both boys to have a separate speech session.

13. At the meeting, Jennifer reiterated her strong view that both boys should be sharing sessions. Caroline voiced her professional opinion that having the children share a session is not in their best interests. She stated that she had tried that in the past, and when two children are non-verbal, there is no benefit to either child.

14. In January 2007, both my sons began receiving speech 2x a week.

15. In May 2007, we attended a transition to preschool meeting at our home. We requested that both our sons be provided additional speech. Jennifer told us we needed to justify why they needed a third session. I explained that John was still showing signs of frustration when unable to fully communicate. Ultimately, and after witnessing a major temper tantrum by John brought on by frustration, she agreed to the third session for him. She had been so confrontational and resistant that both I and Caroline backed down from seeking the third session for Patrick.

16. At this meeting, I requested that both my sons be evaluated for occupational therapy; Caroline supported this request. It had reached the point that we were unable to take our sons anywhere because of the high level of anxiety they expressed. I discussed this with Caroline who expressed that the anxiety may be sensory-based. When we raised this with Jennifer, she refused to consent to our sons receiving an OT evaluation. She stated that they could be evaluated by the school district when they transitioned into the Preschool program. I stated I did not feel we should wait, as it was so apparent that they needed therapy intervention. She remained unmoved.

17. For the Court's information, my sons are qualified to receive Early Intervention services until January 2, 2008, however, I had the option to consent to their transitioning into preschool in September 2007, which I did. The reason I did is because, when discussing the matter with the team, Jennifer made clear that there's a shortage of speech, as well as

other, providers, and that it would be more difficult to find a speech therapist in January than in September. Because of my fear that a speech therapist would not be available in January, I agreed to transition my sons into preschool in September.

18. I was not informed by Jennifer or any other EI official that transitioning out of the EI program and into the preschool program would result in a reduction in speech therapy for my sons. I attended the CPSE meeting and, for the first time, heard that, instead of J.F. and B.F. receiving speech therapy 2x a week for 45 minutes, they were only entitled to receive for for 30 minute sessions. Additionally, the CPSE, including the Orange County EI representative, made clear that they could not themselves "find" a therapist for my sons and, instead, handed me a list of providers and told me basically, to "Start calling.". I was stunned and confused by what I was hearing. I went home and started calling providers from the list. No one returned my calls. Fortunately, my sons' present therapist, Caroline, had a friend who was willing to take over my sons' case. I don't know when services will start for them.

19. At the time I agreed for my sons to transition early into preschool, I did not agree to postpone necessary testing, as my sons' behavior problems were increasing.

My sons were tested through EI, and though I have not yet received the results of the test, I was told by the tester that my sons would not be approved for services.

_____
AnnMarie Flynn

Sworn to before me this
__22__ day of July, 2007.