EXHIBIT 12

# HEALTH & MENTAL HEALTH COMMITTEE
# MINUTES

## THURSDAY, JANUARY 26, 2006
## 3:00 P.M.

PRESENT:  Bernard Winstanley, Chairman
Frank Fornario, Jr., Michael Amo, Michael Paduch, Wayne Decker, Roxanne Donnery, Christopher Eachus, Noel Spencer

ALSO
PRESENT:  Michael Pillmeier, Majority Leader
Anthony Marino, Minority Leader
Antoinette Reed, Legislative Counsel
Edward Diana, County Executive
Mark Nash, Sr. Assistant, County Attorney
Ann Marie Maglione, Assistant to County Executive
Christopher Dunleavy, Deputy Commissioner, Health Department
Sheila Warren, Dir. Early Intervention Services, Health Department
Chris Ashman, Commissioner, Mental Health
Darcie Miller, Deputy Commissioner, Mental Health
Colleen Grogan, Budget Analyst

Chairman Winstanley opened the meeting by announcing that future meetings will begin at 3:30 p.m. For the sake of new members, Legislators Eachus and Spencer, the Chairman mentioned that a good part of the meetings are for the purpose of accepting and rejecting grant money from Albany to support many programs that help residents to prevent the spread of ongoing diseases and promote a healthier lifestyle. A list of grants handled during 2005 was distributed. (A copy is attached to the original minutes.)

Chris Dunleavy, Deputy Commissioner of Health submitted his request for supplemental funds from the NYS Department of Health for the HIV Prevention Program in the amount of $3,804 for the period of July 1, 2005 – June 30, 2006. This is 100% state funded. It's a cost of living adjustment. There is a budget attached for the current year. It is not mandated and there are no county taxes required.

> Legislator Donnery moved the request, seconded by Legislator Decker.

Legislator Spencer questioned the credits and debits on Schedule A and Mr. Dunleavy responded with how one of the unfortunate aspect of grants

management is where we under spend the grant at the State level, then they write us these little checks, which becomes a real burden. They move some money around and in our case, in the Community Outreach organization we get a number of grants. The way they pay for their staff is to charge a person partly to one grant and partly to another, so when the grant money comes available, staff changes during the course of the year. These are the kinds of adjustments charged to a particular grant.

Colleen Grogan, Budget Analyst explained how some grants may be willing to pick up more of the fringe benefits than another grant is willing to. So, they'll trade off between each other and we're not paying the person any less, but if they have a vacancy, they'll help out. They don't have people in every grant and many of their people are spread across many grants. So if one person is promoted and the other spot is left vacant for a while, it frees up some money, so instead of giving it back to Albany, Health jumps on it and finds a way to shift it for use. That's where you see the negatives and the positives.

Legislator Spencer said he saw the budget, and he saw the fringe benefits but didn't see where they were taken from.

Mr. Diana said that they have a number of grants and people are going to be paid an hourly rate with the fringe benefits to which they're entitled under the Union contract, or whatever.

The motion carried.

Chairman Winstanley described the next request as one position of Early Intervention Service Coordinator, Grade 12 in the Intervention Services Division. The justification provided is that it will ease the caseload per coordinator, with no additional county tax required, the position is budgeted in 2006, and the cost of the salary and benefits for 2006 is $58,603.

Legislator Fornario moved the request, seconded by Legislator Donnery.

Legislator Paduch asked for clarification of the caseload of 145-170 children and Mr. Dunleavy clarified that these are caseloads per coordinator and though they are high, they don't see these children every day. As coordinators, they set up services for these children.

Legislator Fornario asked if some of the agencies that we contract out do some of the coordination and how many agencies do they work with?

HEALTH & MENTAL HEALTH COMMITTEE MINUTES                                      3

Mr. Dunleavy answered that there are two kinds of coordinators: initial and ongoing. Ms. Sheila Warren added that the initial service coordinator is the only one we hire. He or she is responsible for assuring that when a child is referred for early intervention, we have an evaluation. We have an Individualized Family Service Plan (IFSP) if it's appropriate, and we make any referrals if this child is not eligible for early intervention, to ensure that none of their needs are overlooked. Once a child comes into early intervention and has an IFSP, that service coordinator then becomes an Early Intervention Official designee. She stated she was an Early Intervention Official and her job is to oversee the whole program. She is responsible to ensure that all IFSP's are carried out, all services are delivered according to policy standard, and all contracts are carried out. We're close to 1700 or 1800 children, there's no way a point person can handle that, so the initial service coordinators can, by law, become designees of the early intervention official and are responsible for overseeing all the IFSP's. Their job then will be to coordinate all the cases that they had to ensure quality adherence to state law and that the families rights are being upheld. They also must attend every meeting that is held on their IFSP team. There are at least two per year for every family and in some cases there are as many as 4 or 5. They must review all the records that come in to ensure that there's quality and there aren't any mistakes.

Mr. Dunleavy asked to interject that Sheila Warren is head of the Intervention Services Division in the Health Department and officially under the state law of the county's Early Intervention Division. There are two programs for preschool children with developmental problems, birth to 3, through Early Intervention in the Health Department. Preschool early education is also state funded through state education and works a bit differently (ages 3 - 5). Ms. Warren's in charge of both.

Legislator Paduch clarified that some of Ms. Warren's job requirements are being done by others. Her job is to oversee the whole program, yet these service coordinators are her designees, actually doing her job as well.

Ms. Warren agreed that it is true in the early intervention program, and she still has responsibilities for everything else in the division. And that's the way it is set up in law.

Legislator Fornario asked if there was an answer to the questions he had regarding the agencies that we work with. Do they coordinate services to take some of the burden off of the county?

Ms. Warren explained that those service coordinators are doing ongoing coordination which is a different function. The family chooses who they would like to have as a service coordinator and we have probably 100 to 150 in the

HEALTH & MENTAL HEALTH COMMITTEE MINUTES                                          4

county under 10 different agencies. Their one responsibility is to ensure the services in the IFSP, which is unique to every child, because it is designed on the child's and family's needs. Their function is to make contact once a month with each IFSP team member as well as the family, to ensure that the services are being provided for them and that they are appearing when they are supposed to. Their function is very particular to the individual IFSP only. They're working directly with the IFSP and the early intervention official designee is looking at following the adherence to the law and also the parents rights.

Legislator Spencer asked Ms. Warren what the minimum requirement for personnel was to manage the caseloads. They saw at the Personnel Committee meeting Tuesday where hiring one person would reduce the caseload. The information says there are 145 – 170 children that need this on any given day and the County Executive said that works out to be 2.5 persons per week but that wasn't matching up. We don't want problems like New York City or anywhere else in the country.

Ms. Warren clarified that the state is looking at 25 – 60 per caseload, and says they're working towards that, they've added people and they're looking at the group.

Mr. Dunleavy said the objective here isn't so much to reduce as much as it is to absorb growing caseload. Staffing in every county department, and certainly the Early Intervention Division, is agreed on by the Legislature, or the County Executive. That's how the budget process works. Growing caseloads outside of the budget, is why we have the incremental increase.

Legislator Spencer asked how many people it will take next year to get the caseload down to the state level of 25 - 60 from 145 - 170, so they're not overburdened.

Mr. Dunleavy said that their obligation is to make a request to the County Executive, normally through the budget process, for a certain level of standard that was operational from Environmental Health to Emergencies, then that's submitted to the Legislature and they make whatever judgments need to be made.

Legislator Spencer said that he didn't want to see a crisis situation again like what happened in New York City.

Mr. Diana said that the crisis in New York City is not Early Intervention. That's a completely different program.

HEALTH & MENTAL HEALTH COMMITTEE MINUTES                                        5

Mr. Dunleavy said where we've had the most difficult problem is in the financial side of this and Colleen knows all too well as does County Executive Diana, we struggle with that. We've reorganized, we made sure positions were filled, with the County Executive's approval, and got it under control. And as time goes on we'll be talking to the County Executive about increasing the staff.

Legislator Paduch asked about the families choosing their coordinator. Of the six we have, will some be more overburdened than others? Ms. Warren clarified that families don't choose those, they choose the on-going service coordinator after the plan is in place from a list that the Health Department provides, and right now there are 10 agencies. Among those agencies, there's probably 150 – 200 people. So they choose an agency and the agency assigns a service coordinator in that agency.

Legislator Paduch asked if they are official intervention designees and it was answered that they are not. He then asked if they send reports back to Ms. Warren and she answered that they all send reports, as all the providers need reports.

Colleen Grogan said that each child actually ends up with two coordinators. They have an advocate that is just for the family and child who is picked from the list that has to be submitted to the state and team. And the other coordinator is an advocate not only for the child, but an advocate for the county and state as well, to ensure that the laws are being followed appropriately and that the work being done is meeting the guidelines. So for every single case, there are actually two advocates.

Legislator Paduch questioned the advocates representing the county and Ms. Grogan said that the employee they're looking to hire right now is one of the six, and that employee is not only looking out for the welfare of that individual child, but also is acting as an agent of the county and the state at the same time. They're only on our payroll.

Legislator Paduch asked if they do the initial assessment and Ms. Warren said the initial assessment is done by a group of evaluators from New York State and there's a list of those that the family chooses from for that.

Legislator Paduch asked if there are any ongoing problems now with different providers that are in need, like in speech.

Ms. Warren responded that yes, there will always be difficulty with speech and they just added some new contractors. We're constantly working with a growth factor in that. Right now the rating is just maybe two children, but that

HEALTH & MENTAL HEALTH COMMITTEE MINUTES                                            6

could change tomorrow. So we're not hurting for people, and we are adding to make sure that the program staff is adequate.

Legislator Marino asked if the county had any input into which agency the family will choose and whether we had any input over the number of children the agency is going to be working with, or overseeing.

Ms. Warren said that they have no input into which agency a family chooses and cannot recommend any by law. A list is provided the family with information written on it and the family selects from that.

Legislator Marino rephrased his question about the agency the parents pick, and wondered if the agency assigns personnel to work with the child, and if the county has any input to make sure that person isn't overburdened with too many children to work with.

Ms. Warren responded that they do have input and have meetings on a quarterly basis with all the on-going service coordinators and talk in terms of case loads. They are monitored to ensure that they are providing services. If services are not being provided, they go back and meet with the supervisor and talk in terms of caseloads. There is a process in place to address that.

Legislator Marino asked if the family was not happy with their case manager, could they change. Ms. Warren said that they have a format to express that they want someone different and can change agencies.

Legislator Decker said that is the quality control built in at that level which makes the agency careful to be responsible and not overload people so they can meet the needs.

Legislator Paduch asked if they were to be given their services in the least restricted environment?

Ms. Warren said that early intervention is supposed to be in the natural environment and that is considered to be where the child would be naturally in that particular home. It might be the home, the nursery school, Grandma's house, or perhaps the Salvation Army because Mom works there and brings her child there. Some family's choose to go to an office (i.e. a therapist's office, INSPIRE or AHRC), if they're not comfortable having someone come into their home. We work with families wherever it would be natural for them to meet.

Legislator Paduch mentioned that the advocate should be looking out for the county financially though. The federal program says that different services are provided less expensively than they are at other agencies, and that's what

HEALTH & MENTAL HEALTH COMMITTEE MINUTES                                           7

the county advocates responsibilities are as well. They make sure the child gets the services they need, in their natural environment at the best cost for the county.

Ms. Warren said that the cost is set by the state and the county has no control over the cost. The state sets the rates and the county does not negotiate. They have no control over what the limits are so they set a rate for the home visit and that's the rate the therapist gets. We look at whether the services provided are appropriate, and whether the child is in need of the intensive services that are available. That's the quality assurance that sometimes results in a savings for the county. But we don't have control over the visits.

Legislator Donnery clarified the term 'least restrictive environment' is regarding the age group three to five.

Legislator Fornario asked how are services provided being verified. Is it from reports that are being submitted or from different agency providers? Do you actually contact the services for actions and liberty to those people?

Ms. Warren answered that 1) reports of progress from service coordinators are submitted; 2) the billing department reports services billed and which ones were delivered and which ones were missed; 3) a quality monitoring tool is sent to the family to complete at least every six months for their feedback on services provided; 4) our service coordinator attends meetings every six months to talk in terms of how these services are having an effect and usually we don't have to look for this information because the families let us know if a service provider didn't show up for three days. The families are so thrilled with the services, they are our first source of information.

The motion carried.

Chairman Winstanley introduced Chris Ashman, Commissioner of Mental Health and Darcie Miller, Deputy Commissioner who were not on the agenda, but wanted to introduce themselves to the new members of the committee.

Legislator Marino, as Chairman of the Medical Examiner Study Committee, presented the report distributed the month prior. The committee was as follows: Co-chairman M. William Lahey, Roxanne Donnery, Steve Brescia, Wayne Decker, District Attorney Frank Phillips, George Greene (7 voting members). The Medical Examiner's position was studied for 3 years. We had speakers come in, made a visit to Poughkeepsie's Dutchess County Medical Examiner's Office, and we looked at cost figures from Colleen Grogan, so we knew in advance that the system was going to cost more money. Knowing this position would cost more

money, it was important to investigate how having the position would also save the county financially, all of which is included in this report.

This was brought to a unanimous vote. In fact, the medical examiner would be under the Health Department and we'll get 30% reimbursement from New York State. Chris Dunleavy, though not a voting member of the committee, voted in favor of it. The Sheriff also voted in favor of it (though not a voting member), and presented a letter from the Police Chief's Association who supported it. We had a 9-0 vote to move forward with the Medical Examiner system. We decided as a committee to do a brief review before this committee, the Ways and Means, and the Rules committees. But at a later date, we're going to invite all the members of the committee, the Sheriff and Chris Dunleavy and any other people you'd like to have, then have an informational meeting for the entire Legislature. There would be questions and then it could be moved to full Legislature for a vote in May. Any questions after reading the report, should be sent to Antoinette Reed, Legislative Counsel, and we'll get back to you with answers if not before that meeting, at that meeting, which will probably will be within the first two weeks of February.

Legislative Counsel Reed described the time line. In order to create the office of Medical Examiner, we would also have to abolish the positions of the coroners who are elected. That would be done by local law in which we would change our Orange County Charter and Administrative Code. Under state law we have to do that 150 days prior to the General Election. When we adopt a local law in Orange County, it goes before the full Legislature and gets voted on by the majority of the Legislature, then goes to the County Executive for approval or veto. The County Executive also has a public hearing on the local law which brings us to June 9, 2006. We would have to pass the local law 30 days prior to that date, because the County Executive has 30 days within which to veto it. In order for us to get this in place for November 2006, we have to vote on it at our May Legislative Session. Because these positions are for elected officials, it is subject to a permissive referendum, which means that a percentage of individuals who voted for the last gubernatorial election would have to file a petition within 45 days of the date that the local law is adopted.

Chairman Winstanley recommended that as everyone reads through this report, put notes where you have questions, and bring the questions to the meeting and hopefully all your questions will be answered there.

Legislator Marino said that the County Executive did participate, he personally came to a couple of meetings, but usually someone from his office was there and he gave his unofficial stamp of approval and we looked at the cost figures and he said he could get this down to a little less than what it is, which we did. He came back the following month to adjust things on some of the

positions, and on whether or not we should buy, versus renting automobiles for the medical examiner.

Chairman Winstanley added that the population of Orange County just keeps going up and up, so he thinks it's a step in the right direction.

Legislator Marino said it was a great committee, very professional, very objective. It was not at all political. They got along very well.

Legislator Decker spoke to the cost and said we tried to be very careful to identify all the costs and not low ball them. We didn't want to start this position with too low a number and next year find costs to be escalating. We tried to identify everything and were a tad on the high side. The County Executive found ways to trim that back a bit, but we really included all the positions we think that will be needed.

Legislator Brescia wanted to make a statement that this has no reflection on the job that the coroners have done, it has to do with the change in times, the change of population. That is why we're going ahead with this.

Legislator Marino said we would have the District Attorney at the informational meeting and he was very enthusiastic and supportive of it and could give insight into some problems he faces that we're not even aware of.

Legislator Donnery said with the population we have now we'll have something equally professional which is meaningful. She thought it was the best committee she'd ever been on. Colleen did a lot of work on a lot of numbers. We learned a lot and I think we came away together thinking even though there are additional costs, it is the right thing to do and the right time for the county.

Legislator Fornario asked that if everything goes according to the time line and it gets approved, with permissive referendum or no permissive referendum, would it start in 2008?

Ms. Reed reasoned that it would be 2008 because we're in the budget process in July 2006 for 2007.

Legislator Fornario asked if it will be tied into the drawings of the 911 center. He said that this will also have some impact in terms of the initiation of the medical examiner position.

Legislator Marino replied they provided space there--originally they labeled it as coroner space. But ultimately there would be space there for the medical examiner.

HEALTH & MENTAL HEALTH COMMITTEE MINUTES                                             10

Legislator Brescia said it was designed really with the medical examiner in mind.

Ms. Grogan said that the first May date does give the County Executive time to look at the budget he presents to you in October, that it's his prerogative to see that there are mechanisms where the finances could be there if his decision is to go ahead in 2007. That would be something discussed during the Executive's budget.

Chairman Winstanley said that another issue is if it goes to permissive referendum, then you're going into a November vote. But the goal is to have everything ready to go anyway.

Ms. Reed said her assumption is that it will go on the ballot. She did have one precautionary measure. In the packages, there is an organization chart and there are classification descriptions of positions, those were not reviewed by the Personnel Department or the Commissioner of Personnel. We mirrored it, or had input from the Dutchess County Medical Examiner and based upon history of the way we set up departments in Orange County, what would be the basic personnel structure of a small department of this kind at this time. So the grades are just something to remember are not exact; the per diem rates are not exact; they all have to be subject to Personnel.

Ms. Grogan said we went high, or maximum of what we thought so we wouldn't be short-handed financially. Having the lengthy history of financially working with the Health Department, and having a little bit of knowledge in what's needed to interact with the financial staff and the responsibilities of us getting that 30% reimbursement also came into play.

Legislator Spencer asked if there were any coroners who are up for re-election and Ms. Reed said she's not sure but they do have staggered terms. She also said that under the Charter, when we do our local law, we would abolish all of these positions, no matter if they were elected that year, or three years ago. Of course, there's going to be a period of transition and one thing needed to be worked on is what the effective day of the local law would be.

On motion, the meeting adjourned at 4:39 p.m.