UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------X
S.W., by her parent and natural guardian, J.W.,
individually and on behalf of all others similarly
situated; A.W., by her parent and natural guardian
A.W., individually and on behalf of all others similarly
situated; B.F., by his parent and natural guardian, P.F.,
individually and on behalf of all others similarly
situated; J.F. and P.F., by their parent and natural guardian,
A.F., individually and on behalf of all others similarly
situated; L.T., by her parent and natural guardian, R.T.,
individually and on behalf of all others similarly situated,

**AFFIDAVIT OF**
**SUSAN LEE**

Civ. Action No.
07 CIV 5708 (WCC)

                              Plaintiffs,

            - against -

SHEILA WARREN, sued individually, and as
Director of Early Intervention Services for Orange County,
ORANGE COUNTY DEPARTMENT OF HEALTH,
COUNTY OF ORANGE,

                              Defendants.
--------------------------------------------------------------------------X


STATE OF NEW YORK    )
                     )    ss:
COUNTY OF ORANGE     )


        SUSAN LEE, being duly sworn, deposes and says:

        1.      I served as the County of Orange's Early Intervention Service Coordinator from

September 24, 2001 through February 21, 2005 and as the County of Orange's Special Education

Program Coordinator from February 21, 2005 to present.  I submit this Affidavit in Opposition to

Plaintiffs' Request for Preliminary Injunctive Relief.  I have knowledge of the facts and

circumstances set forth herein based upon my personal involvement with children and their

families or based upon my review of the records maintained by the County's Early Intervention

Program (EIP).

2.     In my capacity as Special Education Programs Coordinator, my responsibilities include but are not limited to providing support to the Orange County school districts' Committees on Pre-school Special Education (CPSEs), serving as a resource to all CPSE Chairpersons, families and Intervention Services staff, and attending CPSE meetings as the County representative.

3.     In my capacity as Early Intervention Service Coordinator, my responsibilities included but were not limited to the provision of service coordination to children with special needs (ages birth to 36 months) and their families. This involved serving as an Initial Service Coordinator (ISC) in facilitating the development of Individualized Family Service Plans (IFSPs), which identify and coordinate services from appropriate agencies and individuals . In this capacity, I have attended and participated in meetings concerning Plaintiffs S.W. and B.F. where Early Intervention (EI) services were involved. I also attended meetings for A.W., S.W. and B.F. as Special Education Program Coordinator regarding Preschool services. EI services are designed to meet both the developmental needs of eligible children (generally through age two) and their families as it relates to enhancing their children's development. During these collaborative meetings, each child's needs, goals and progress are reviewed by his or her team, which includes service providers, ongoing service coordinators, evaluators and early intervention official designee. At EI meetings, Plaintiffs' IFSPs were developed and amended on an as-needed basis, in accordance with the County's obligations under the law, taking into consideration the individual, unique needs and abilities of each child as reported by the evaluators, service providers and the families themselves. These meetings were collaborative in nature and occurred throughout the time the Plaintiffs participated in the Early Intervention Program.

2

As an Initial Service Coordinator ("ISC"), I wish to advise the Court that at the initial intake meeting held with the parents of a child who has been referred for EI services, the ISC routinely discusses the specific concerns about the child that led to the referral, the purpose and scope of the EIP, how the program works, the parents' participation in the planning and implementation of the child's IFSP, the parents' due process rights and private insurance issues. During the initial intake meeting, we also complete an intake questionnaire and have the parent choose who will evaluate the child.

4.      Prior to the initial intake meeting, the parents have usually received a copy of the Parents Handbook from the EIP Office (Exhibit L). This handbook is routinely sent to parents along with a welcome letter and a letter regarding insurance issues. During the initial intake meeting, I also always reviewed the Handbook with the parent and, if the parent had not yet received the Handbook from the EIP Office, I would provide the parent with a copy of the Handbook during the meeting.

5.      I am not aware of any policy and/or practice pursuant to which the County limits the number of ABA therapy hours that may be recommended for a child. Rather, in both the EIP and Preschool programs, the unique needs of the child are considered by the multi-disciplinary team in developing the IFSP or the IEP.

6.      With respect to the plaintiffs and the affidavits submitted by parents of the infant children in support of their application for preliminary injunctive relief, I note as follows:

**A.W.**

7.      Anita Wilson's affidavit, sworn to on July 24, 2007, states that A.W. was diagnosed with autism on December 15, 2004 (2 years, 6 months) and she was subsequently approved for 25 hours of ABA therapy a week. Ms. Wilson's acknowledgement that the IFSP

recommended 25 hours of ABA per week for A.W. further confirms that the County does not have a policy or practice of limiting ABA therapy hours to 10.

8.      Although Ms. Wilson now complains that A.W. did not receive the 25 hours of ABA for which she was approved in January 2005, at no time did she exercise her due process right to an impartial hearing on this issue.

9.      Ms. Wilson avers that on January 18, 2005 an individualized education program (IEP) was developed with a start date of September 2005 and that A.W. was placed in a full day program at the Inspire Preschool. In accordance with New York Education Law, the IEP for preschool services was developed by A.W.'s school district, not the County. Any issues regarding the IEP itself, or the services provided by the school district pursuant to the IEP, must be addressed to the school district, not the County.

10.     Ms. Wilson concludes that the reduction in ABA therapy hours that were recommended at the November 9, 2005 CSPE meeting was due to a lack of providers. There is no basis stated for this conclusion. Additionally, Ms. Wilson describes her disagreement with the CPSE's determination and the steps she took to change the determination. In fact, the IEP was amended and the services that Ms. Wilson requested were provided.

11.     It is noteworthy that A.W. has now aged out of the Preschool program and is attending kindergarten. She has not been eligible for EI services since September, 2005 when she entered the Preschool program and she is not now eligible for Preschool services.

**B.F.**

12.     Initially, I note that the affidavit of Patricia Flynn is not notarized. Ms. Flynn's son B.F. was born on April 21, 2003. B.F. was evaluated for Early Intervention services in February 2004 and began receiving services thereafter.

13.     The issue addressed by Ms. Flynn in her affidavit is that a claim that she submitted to her insurance company was rejected because B.F. had "maxed out" of the therapies that he was allotted.

14.     Ms. Flynn refers to a conversation that I had with her in or about January, 2004. I believe that she is referring to the intake interview that I conducted on or about February 26, 2004. At all initial intake interviews, including the interview with Ms. Flynn, I obtain insurance information from the parents and explain the New York State Regulations relating to the County's billing of Early Intervention services to insurance companies, including that there are no out of pocket payments, no deductibles, that the billing does not affect any benefit caps and that they parent(s) should contact us if anything is received from the insurance company that the parent(s) does not understand.

15.     Additionally, as discussed above, when a child is found to be eligible for EI services, the family is routinely sent an introductory letter and a letter explaining the use of private insurance. Copies of the letters sent to Mr. and Mrs. Flynn are collectively annexed hereto as Exhibit M.

16.     B.F. aged out of the EIP in April, 2006. He then qualified for Preschool services and is currently receiving services pursuant to an IEP developed by his school district.

17.     While the County is responsible for payment for Preschool Services, in accordance with Education Law requirements, the County does not bill the child's insurance company for these services absent consent of the parent. The County has not and is not billing B.F.'s insurance company for any of his preschool services.

5

**P.F. and J.F.**

18.     The affidavit of AnnMarie Flynn, dated July 22, 2007 (but not notarized),
expresses disappointment with the frequency of speech therapy recommended for her sons in the
EI program and the preschool program.  Here, again, it should be noted that the parent failed to
exercise her right to a due process hearing on this issue.

19.     Ms. Flynn's affidavit also indicates that she consented to transitioning her sons to
the Preschool program in September 2007.  The team's purported statement as noted in
paragraph 18 of Ms. Flynn's affidavit, that it would be more difficult to find a speech therapist in
January than in September is factually correct.  Service providers for the Preschool Program
generally fill their available time on a school calendar basis.  Therefore, there tends to be a
greater availability of service providers in the Fall, than in the Winter.

20.     As noted above, Ms. Flynn voluntarily transitioned her sons into Preschool and is
likewise disappointed with the frequency of speech services included on the IEPs.  Any concerns
she may have about the frequency of services provided in the preschool program, however,
should be addressed to the school district, which is responsible for the provision of these
services.

21.     Further, with respect to the statement in paragraph 18 of the affidavit that Ms.
Flynn does not know when speech services will start for her son, the Court should note that it
appears that Ms. Flynn's affidavit may have been signed on July 22, 2007 (though it was not
sworn under oath and notarized), while her sons' participation in the Preschool Program was not
to commence until September 2007.  Plaintiffs have not submitted any information indicating
that the children in fact did not begin to receive services in September 2007 through the school

district. Even if they did not commence services on time, this once again is an issue that the Plaintiffs need to address with the school district, not the County.

22.    Finally, it should be noted, that Ms. Flynn confirms that the County granted her request for an Occupational Therapy evaluation.

**L.T.**

23.    L.T. was born on July 16, 2004. The affidavit of Michele Thompson sworn to on September 11, 2007 indicated that L.T. was initially evaluated for EI services in August 2006. L.T.'s services were increased over time in accordance with her initial IFSP and amendments thereto. Ms. Thompson's affidavit confirms that L.T. transitioned into the Preschool Program on August 31, 2007. An e-mail from speech pathologist Jennifer Wallingford explaining her inability to continue providing services for Preschool programs is annexed to the Affidavit of Sheila Warren as Exhibit C.

**S.W.**

24.    The affidavit of Jason Whateley and Jessica Whateley, S.W.'s parents, sworn to on August 7, 2007 states that S.W. was initially evaluated for EI services in or about January 2005, when S.W. was 18 months of age. Mr. and Mrs. Whateley also state that, at the suggestion of a service provider they had S.W. evaluated by a pediatric neurologist in November, 2005. They acknowledge that S.W. received ABA therapy, but complain that the hours of ABA therapy provided fell short of the 30 hours per week that was prescribed by the pediatric neurologist. S.W. received speech therapy, but the Whateleys expressed dissatisfaction with the service provider. When the speech therapist that had been providing services was discharged, at the Whateleys' insistence, with no substitute in place, S.W. went without services.

25.    No request for an impartial hearing was made while S.W. was eligible for Early

Intervention services, or thereafter. This is particularly noteworthy given that S.W.'s

grandmother, Mary Jo Whateley, is an attorney who, according to her affidavit, represents

disabled children and adults in advocating for appropriate services and medical treatment,

attended a number of S.W.'s IFSP meetings, during which S.W.'s mother expressed satisfaction

about the services being provided to S.W.

_____
SUSAN LEE

Sworn to before me this
16th day of October, 2007.

_____
Notary Public

CHRISTINE SACCONE
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01SA6167545
QUALIFIED IN ORANGE COUNTY
COMMISSION EXPIRES JUNE 4, 20 11

8