UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X

S.W., by her parent and natural guardian, J. W.,
Individually and on behalf of all others similarly
Situated; A.W., by her parent and natural guardian
A.W., individually and on behalf of all others similarly
situated; B.F., by his parent and natural guardian, P.F.,
individually and on behalf of all others similarly situated;
J.F. and P.F., by their parent and natural guardian,
A.F., individually and on behalf of all others similarly
Situated; L.T., by her parent and natural guardian, R.T.,
Individually and on behalf of all others similarly situated,

**AFFIDAVIT OF
SHEILA WARREN
IN OPPOSITION TO
PLAINTIFF'S
REQUEST FOR
PRELIMINARY
INJUNCTIVE RELIEF**

                                Plaintiffs,

                        - against -

07 CIV 57808 (WCC)

SHEILA WARREN, sued individually, and as
Director of Early Intervention Services for Orange County,
ORANGE COUNTY DEPARTMENT OF HEALTH,
COUNTY OF ORANGE.

                                Defendants.

----------------------------------------------------------------------X

STATE OF NEW YORK     )
                      ) ss:
COUNTY OF ORANGE      )

     SHEILA WARREN, being duly sworn, deposes and says:

     1.    I am the Director of Intervention Services for the County of Orange, New York and have served in this capacity since March 30, 1993. I submit this Affidavit in Opposition to Plaintiff's Request for Preliminary Injunctive Relief.

     2.    The New York Public Health Law requires all counties to appoint a public official as their Early Intervention Official (EIO). I serve as Orange County's EIO. In this capacity, I am responsible, through the County's Department of Health, for finding eligible children (those under the age of three who have a developmental delay or a disability), insuring that eligible children have

have a multi-disciplinary evaluation, appointing an initial service coordinator to help families with their child's multi-disciplinary evaluation and developing an Individualized Family Service Plan ("IFSP") based on the results of the evaluation, insuring that children and families get the early intervention services specified in their IFSPs and safeguarding children and family rights under the Early Intervention Program.

3.    In addition, I oversee the County's statutory obligations with respect to the Preschool program. In that capacity, I am liaison with the CPSE chairs and providers, insure the provision of a list of providers, provide County representation as available and/or requested at CPSE meeting and insure payment to providers and appropriate billing to Medicaid and the State for the costs of the Preschool program.

4.    I submit this affidavit in opposition to the Plaintiffs application for a mandatory injunction requiring the Defendants to :

a.    Immediately rescind each and every policy and/or practice which curtails or limits the number of available service providers to children in both the Early Intervention and Preschool programs;

b.    Immediately rescind each and every policy and/or practice by which defendants arbitrarily limit the number of ABA therapy hours they provide plaintiffs and those in the class they seek to represent;

c.    Immediately identify those class plaintiffs who have not been provided timely and/or adequate early intervention and/or preschool services, and ordering defendants to immediately provide to the identified plaintiffs the appropriate early intervention and/or services guaranteed them by law;

d.    Immediately rescind each and every policy and/or practice by defendants that authorize the billing of participating families' insurance carriers for services provided to children in its Early Intervention and/or Preschool programs, such that families suffer a reduction of benefits and lack of coverage for services which may later be required;

e.    Immediately identify those class plaintiffs whose insurance companies defendants have billed causing a reduction or loss of benefits and/or the lack of coverage for future medical services; and

f.    Immediately commence transporting plaintiff A.W., and any other similarly aggrieved class plaintiff, to school by means of the shortest, safe bus route.

5.    As will be described more fully herein, and in the accompanying Memorandum of Law, plaintiffs are not entitled to the relief that they seek.  It appears that the relief that they request by this motion is similar, if not identical, to the ultimate relief that is asked for in the complaint.  It thus appears that plaintiffs seek to secure the ultimate relief that they are looking for without ever having to prove the underlying allegations of the complaint.

**Introduction**

6.    It is important that the Court have a firm understanding of the differences between the Early Intervention Program ("EIP") and Preschool Special Education.  "The EIP: focuses on enhancing the development of infants and toddlers with disabilities, and minimizing their potential for developmental delay; minimizes the need for special education services when children reach school age; and enhances the capacity of families to meet the special needs of their infants and toddlers with disabilities. . . . Preschool special education focuses on children's education needs, including: ensuring access to the general curriculum for all children; and strengthening the role of

3

parents and ensuring families have meaningful opportunities to participate in the education of their children at school and at home." The Transition of Children from The New York State Department of Health Early Intervention Program to The State Education Department Preschool Special Education Program or Other Early Childhood Services, February 2005, Exhibit A annexed, p.p. 3-4. Under the EIP, the County is responsible for the development and implementation of an Individualized Family Service Plan ("IFSP") and the payment for services provided thereunder. However, it is the school district of residence that is responsible for the development and implementation of an Individualized Education Plan ("IEP") for children entitled to Preschool Special Education Services. The County is only responsible for the payment of services provided pursuant to an IEP. Once the child reaches school age (Age 5), the County's IDEA obligations toward that child ceases.

7.    With respect to the relief requested, I wish to advise the Court that defendants do not have a policy and/or practice which curtails or limits the number of available service providers. The defendants have adopted polices and/or practices which are designed to increase the quantity and quality of services that are provided to eligible children. Moreover, the County merely contracts with service providers. It does not license or approve them, which is a responsibility solely in the province of the State. The County's requirement that is so vehemently attacked by the plaintiffs does not curtail or limit service providers. Rather, it encourages professional collaboration, supervision and best practices, while streamlining the County's ability to administer services and payment.

8.    Nor do defendants have a policy and/or practice that limits the number of ABA therapy hours that are provided to any child who is eligible for services. Rather, in compliance with the law, each child is individually evaluated and a plan for services is developed by a team of

experts and the child's parents, to satisfy the particular needs and circumstance of each child. As will be more fully described herein, the County develops an IFSP that contains the type and frequency of services that are appropriate for each child that is eligible for Early Intervention services. The County also implements the IFSP. The school district of residence bears responsibility for creating and implementing an Individualized Education Program (IEP) for any child who qualifies for Preschool Services.

9.     In accordance with its obligations the County provides transportation to eligible children using the shortest and safest route available. See Affidavit of Jean Hudson, sworn to on October 16, 2007, also submitted in opposition to this motion.

**Background**

10.     As a preliminary matter, an overview of the County's role in the provision of services to children in the County between birth and their becoming of school age is provided.

11.     Children under the age of three years who have a disability or developmental delay are eligible for the EIP. When a child is referred to the EIP an initial service coordinator is chosen. The initial service coordinator helps the family with all of the steps necessary to have the child evaluated to determine the child's eligibility for services. A multidisciplinary evaluation of the child for eligibility for early intervention services is then arranged and conducted. The evaluation is conducted by evaluators chosen by the parents from a list of evaluators provided to the parents by their initial service coordinator. If the evaluations show that the child is eligible for the EIP, a meeting will be scheduled to develop an IFSP. An ongoing service coordinator, who will continue to work with the family during the period that the child is eligible for Early Intervention services, will be chosen at this time from the list provided by the County. The IFSP is generally completed

within 45 days. The IFSP will include the types of services, frequency and duration of the services to be provided to the child.

12.    Children continue to be eligible for Early Intervention Services until they reach the age of 3 years. Between the ages of 2.5 and 3 years, if a child is referred to Early Intervention for evaluation, we counsel the parents about their available options. Depending upon when the child's birthday falls, the parent is encouraged to choose between two options: have the child evaluated for Early Intervention Services and an IFSP developed, while simultaneously having the child evaluated separately for Preschool Services by the School District's Committee on Preschool Special Education ("CPSE"), or just refer the child for evaluation and services by the CPSE. The County counsels parents about these issues and encourages a plan of action that would maximize available services for the child and avoid a disruption of continuous services. The New York State EIP Transition Guidance, Exhibit A, p. 8, states, "[i]t is strongly recommended that primary referral services and parents of children age two and a half or older, who may have a developmental delay or disability and are not in EIP, contact their school district CPSE to begin the CPSE process." This Guidance, also provides that:

> "If a child is referred to the EIP when s/he is age-eligible for services under Section 4410 of the Education Law and has a disability or developmental delay that may impact on his/her education, the EIO may recommend to the parent that s/he refer the child directly to the CPSE rather than continue with the referral to the EIP. However, if a parent chooses to continue with the child's referral to the EIP, the EIO must designate an initial service coordinator and the service coordinator must assist the parent in the receipt of a multidisciplinary evaluation consistent with EIP requirements. The multidisciplinary evaluation must be completed and an IFSP must be developed within forty-five calendar days of the child's referral. The initial service coordinator must also explain to the parent that to ensure the child continues to receive services when s/he turns three – either through the EIP or preschool special education - the child must also be referred to the CPSE and be determined eligible for services under Section 4410 of the Education Law by her/his third

birthday. If the child is found eligible for services under Section 4410 of the Education Law by the child's third birthday, the parent then has the option to transition his/her child to preschool special education programs and services, or the child may remain in the EIP until s/he ages out of EIP."

(Exhibit A, at 8).

Accordingly, the County will work with the parents to pursue Early Intervention services and/or a referral for Preschool services.

13.   A child who is no longer eligible for Early Intervention services based on his or her age being between ages of three and five transitions into the Preschool Program administered by the New York State Department of Education and provided through the local school districts, subject to parental consent and qualification for services.  The Preschool Program is established pursuant to the requirements of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq*. and New York Education Law § 4410.

14.   Decisions concerning whether a child is eligible for preschool services, and the type and level of services a child is to receive in the preschool program are determined by the child's local school district based on recommendations made by the School District's CPSE.  After an IEP is developed by the CPSE, the School District is responsible for arranging for the services listed in the child's IEP.  The District is responsible for locating and arranging for service providers from the County list to implement the services included on the IEP.  The school district can also locate and arrange for services with a New York State licensed provider who is not on the County list and the County then has 45 days within which to contract with the provider.  The agency requirement is inapplicable in this situation.  Services commence before the provider is under contract with the County but the service provider cannot be paid until the contract has been processed.  In my 14

years with the County, the County has never refused to contract with a service provider selected by a school district.

15.    The County is not a mandated member of the CPSE. A representative of the County may attend a CPSE meeting, as available, but attendance by the County is not necessary or required. The County has a representative attend as many CPSE meetings as possible, but does not have the staff or resources to have a representative present at every CPSE meeting conducted by each of the 19 school districts in the County. When a County representative attends the CPSE meeting, (s)he becomes a member of the CPSE.

16.    Aside from maintaining a list of available service providers, arranging for payment of the service providers, and attending CPSE meetings upon request, the County has no role in the provision of Preschool Special Education Services. All decisions about eligibility, the nature and scope of services, as well as the actual provision of services, are made by the individual School District.

17.    Likewise, the CPSE determines the level and duration of services provided to each student during the school year and, if warranted, during the extended school year (July and August). Extended school year services are only to be provided when services are necessary to prevent "substantial regression", as per the requirements of New York Education Law and the IDEA. In Orange County, some school districts choose to run six week extended school year programs while others run eight week programs, both of which exceed the State requirement that extended school year services are provided for 30 days. Thus, the school district programs either provide the minimum number of days for which services are required, or exceed the minimum standard. The County has no influence or role in the individual school district decisions about the

length of the extended school year program it will offer.  The County merely pays for extended

school year services based upon the CPSE's recommendations.

18.    The plaintiffs do not distinguish the different roles that the County plays with regard

to the EIP and the Preschool Program.  Yet, an understanding of these different roles is imperative

to an analysis of the plaintiffs' claims and their request for injunctive relief.  As the lead agency

for the administration of the EIP, the County is responsible for the development of the IFSP,

securing the services necessary to provide each child the services set forth in the IFSP and for the

payment for those services.  The School Districts are responsible for the development of an IEP for

children that are eligible for Preschool services.  The School Districts are also responsible for

locating and arranging for the services set forth in the IEP.  The County is only responsible for the

payment to the providers for the services.

**Availability of Service Providers**

19.    Service providers for the Early Intervention and Preschool programs are engaged by

the County pursuant to a service contract.  Prior to even being considered as a service provider for

the EIP an applicant must obtain an approval by the New York State Department of Health.  The

State application process is separate and apart from the contract process with the County and must

be completed prior to the County contract process.  Forms of the applications for approval to be

submitted to the NYS Department of Health are annexed as Exhibit B.  With respect to Preschool

services, center based program and Special Education Itinerant Teachers must be licensed in their

particular specialty by the State of New York and they must be approved by the New York State

Department of Education, prior to seeking a County contract.  All other service providers that are

referred by a CPSE need only be licensed by the State in their area of specialization in order to

apply for a County contract.

20.    Each contract submitted to the County requires a very substantial amount of work on the County's part. As the Director of Early Intervention Services, I interview each potential provider. One of the topics that is discussed with a potential provider during the initial meeting is whether the potential provider wishes to provide services for the EIP and/or the Preschool program. The Intervention Division mails three reference forms to the potential provider for completion. When the completed reference forms are returned, I review the completed forms and, if the references are satisfactory, a contract is prepared. The contract is mailed to the provider, along with a cover letter explaining what is to be returned to the county, a business associate agreement and Medicaid forms for Early Intervention and/or Preschool providers. If the provider is going to be an Ongoing Service Coordinator, an additional schedule is mailed along with the Contract. The Vendor Master Profile Form for provider billing information is also sent to the provider. The contract cover sheet and the reference forms are kept in the office until the executed contract is returned from the provider. Upon receipt of the contract from the provider, it is reviewed to insure that all appropriate pages are signed and that all certificates, New York State Department of Health approval letters, licenses, insurance, disability and/or workers' compensation forms are attached. The contract is then logged in to Excel as having been received and is sent to billing along with a memo so that a Service Requisition number can be assigned. Billing will notify me once the Service Requisition number is assigned and the contract has been forwarded to the Deputy Commissioner and this information is logged into Excel. When the contract is returned from the Deputy Commissioner, this information is logged in Excel and the contract is then sent to the Law Department to be sent for approval signatures from the Law Department, the Budget Department, Risk Management, Personnel and finally the contract is given

to the County Executive for signature. Each of these Departments engages in its own review of the contract.

21.    When the contract is returned to me from the County Executive, it is logged in to Excel and copies are sent to the Finance/Contracts Department and a full copy is sent to the department fiscal unit with a memo requesting the assignment of a Purchase Order. The original contract will be filed in the Health Department. The provider is added to the County's Provider Main List and the list for the current year showing the date the contract is sent to the provider. An email is sent to all Ongoing Service Coordinators, CPSE Chairpersons and the consultant coordinator for the provider search system, notifying them of the added provider. If the provider is for Early Intervention, the information is also added to the State Survey List, the Ongoing Service Coordinator List, if applicable, the Evaluation Choice form (if applicable), the Early Intervention Evaluator List (if applicable). In addition, the NYS Department of Health is emailed about the additional provider. Once Health Department Billing sends us a purchase order (PO), the PO is logged in Excel and my office contacts the provider to set up an appointment with me and the billing staff. During the meeting with the provider, I explain the role and responsibility of the provider in the Early Intervention and Preschool Program, review the Early Intervention Procedure Manual and the Preschool related services manual, and answer any questions that the provider may have. The Billing Department meets with the provider to give and review with the provider the paperwork required for them to bill for their services. I meet with the provider and give them a letter approving them to start billing, a fully executed copy of the provider contract and their PO number. If the provider will be providing Early Intervention Services, the provider is also given a copy of the Early Intervention Manual. The Preschool Related Services Manual is provided to

those service providers who will be giving Preschool services. These meetings are also logged in to Excel.

22.   All of these extensive procedures and reviews take the same amount of time to perform whether the provider will be servicing one child or 20 children.

23.   Given the amount of work that is involved in processing each contract, the County considered implementing a requirement that service providers have at least five cases in order to contract with the County. Prior to implementing this requirement, the County's Department of Health checked with New York State Department of Health (NYSDOH) and the NYSDOH advised that the County has the right to decide with whom it will contract and to set requirements on the number of cases serviced by the contract provider. The County then decided to implement the aforementioned requirement.

24.   In a November 2000 meeting of service providers, the County advised that it would be implementing a requirement that each provider have at least five clients in order to maintain a contract with the County. To avoid any harsh results, the County gave service providers who already had contracts with the County an eighteen month period during which they would have to increase their case loads to five students if they wished to continue to contract directly with the County. It is important to note that there are many reasons that a particular service provider will decline cases. In my experience the vast majority of service providers that decline EIP and/or Preschool assignments do so for personal reasons, unrelated to County policies. For example, see Exhibit C.

25.   Several providers who did not want to handle five cases joined agencies so as to avoid this requirement. At the end of the eighteen month period, only a few service providers were dropped. However, absolutely, no child lost services as a result of this change.

26.    In or about 2003, the County determined that all future EIP contracts would be with agencies and that it would not enter into any new contracts with independent service providers. The County's decision to do so was based on its experience over the last few years. The County wanted to insure that there was oversight over the service providers. The agencies add levels of oversight in that their supervisors oversee the individual providers, engage in case reviews, provide cooperative education services, and discuss practice methods and modalities. Another advantage of using an agency is that providers have others within the agency with whom to consult about best practices for each child, family, methodologies and knowledge about community resources.

27.    Over time, most of the independent service providers who had County contracts went to work for agencies. There are several independent service providers who approached the County about setting up their own agencies and one is in the process of doing so now. No child lost services as a result of this change either. In fact, today 40 independent service providers continue to have contracts with the County and will be allowed to continue to do so as long as they meet the five case load.

28.    Since 2000, only one agency who has applied for a contract with the County has been denied a contract. That agency was unable to provide the County with three references, which is an absolute requirement before the County will contract with an agency to provide services to toddlers and young children.

29.    The end result of the changes in the County's requirements has been an increase in the number of agencies with whom the County contracts. In 2000, the County contracted with only 40 agencies, whereas in September 2007 the County has 53 agency contracts. The number of children being serviced by the EIP has also increased by approximately 48% from 2000 to 2007.

For Preschool, the number of children being serviced has increased by approximately 21% from 2000 to 2007.

30.    The County's contract requirements are not unique.  Westchester County requires all new contracts to be with agencies, and active individual contractors must maintain a caseload of five clients if they provide either Early Intervention or Preschool Special Education Services and eight clients if they provide services through both programs.  For the last 10 years, Nassau County has contracted only with agencies.  Dutchess County only contracts with agencies.  See Exhibit D. Rockland County predominantly contracts with agencies, and only retains a few individual service providers.  Putnam County will now only contract with agencies and when it had individual provider contracts that County also had a five caseload minimum.

31.    There is a nationwide lack of speech-language pathologists and ABA-therapists. Orange County, like most other counties in the State, at times has experienced a shortage of service providers.  See Exhibit E.  The County's demand for special education and related service providers at times has outpaced the available pool of service providers and placements.  The County has taken many steps to locate available service providers, including contacting the State Department of Health, placing newspaper ads, contacting providers, agencies and schools, and even service providers approved in other counties.

32.    The County periodically asks agencies to review their recruitment of staff and has made suggestions to the agencies about recruiting methods and techniques.

33.    In recent years, Orange County has experienced an unprecedented and completely unpredicted growth in its population.  See articles annexed as Exhibit F.  For several years now, the County's population has been the fastest growing of any County in the State.  This population growth has been spearheaded by people of child bearing age and who are just starting their

14

families, resulting in an exponential growth in the number of children in need of early intervention and preschool services.

34. Although the County has no statutory obligation to seek out and develop new service providers or programs, the County is always actively searching for more providers and additional placements so as to be able to satisfy its obligation to provide Early Intervention services. We track trends and service provider and placement openings and try to anticipate upcoming needs ahead of a shortage. See for Example Exhibit G. We also contact potential providers to let them know about agencies in the County for whom they might work. See for example, Exhibit H.

35. On a quarterly basis, my office meets with pre-schools and CPSE chairs and service coordinators and encourages them to create more programs and options for the children. We meet yearly with service providers. Even when we are successful in encouraging an entity to open a new program, the state approval process takes about a year before a new preschool program is approved by the State. The County writes a letter in support of the new program but has no other role in the State's approval process, and has no control over the timing.

36. Admittedly, and unfortunately, there are no centers for children with autism in the County. For example, the County worked with Inspire, a private special education preschool, to develop an Early Intervention group developmental model as a transition program for autistic children and other Early Intervention children. That program is now operational. Inspire and AHRC have already increased their capacity to work with preschool children with autism in response to County requests. The County has also convinced Easter Seals to expand its Project Discovery in Port Jervis and that program is expected to expand in 2009. We have also encouraged the Keller School from Rockland County to open in Orange County but the school has

declined to do so. Dynamic Therapy and Learning has also expressed an interest in opening an autism program in the County and is looking at potential sites.

37.   The County is constantly meeting with agencies and providers to encourage them to provide new programs within the County. On a quarterly basis we meet with the surrounding counties to discuss ways to encourage new programs to open in the County. We meet with the providers at least two times a year and the Service Coordinators two to three times a year to brainstorm about ways to attract new programs. We also meet with the local Early Intervention Coordinating Council which is an advisory council that consists of a variety of service providers, parents, community members and school district personnel to discuss new programs and approaches to service delivery.

38.   Regardless of how many programs are available in the County, though, once a school district includes a service on the IEP, it is the School District's responsibility to insure that the service is provided. Nothing that the County does lessens this responsibility of the School District for children age 3 and above.

39.   Plaintiffs complain about a difference in the rates paid to providers in the early intervention and the preschool programs. The rates for the EIP ($82 per 45 minute visit) are set by New York State and are not within the County's control. See Title 10 § 69-4.30, a copy of which is annexed as Exhibit I. While the County sets a lower rate for the Preschool Program ($40 for a ½ hour session), the level of difficulty of the work for the preschool providers is substantially less than that of the Early Intervention providers. Preschool providers are not required to attend meetings, only have to complete three computerized progress reports and an annual report and do not have to be in contact with the team as frequently as Early Intervention providers. The County's preschool rate is also comparable to that paid by other counties.

**The County Sets No Limits on ABA Therapy Hours**

40.    The County imposes no limits or restrictions on the number of ABA Therapy hours

that may be provided through the early intervention program.  Similar to all early intervention

services, the number of hours provided is determined based upon the needs of the individual child

and family and the ISC completes the IFSP for those services.

41.    As a general rule, though, ABA services are started slowly and increased as the child

adapts to the services. This procedure is fully supported by The Clinical Practice Guideline, Quick

Reference Guide for Parents and Professionals, Autism/Pervasive Developmental Disorders,

sponsored by New York State Department of Health, Division of Family Health, Bureau of Early

Intervention, p. 34.  "The precise number of hours of behavioral intervention may vary depending

on a variety of child and family characteristics.  Considerations in determining the frequency and

intensity of intervention include:  age of child, severity of autistic symptoms, rate of progress,

other health considerations, tolerance of the child for the intervention and family participation."

(Exhibit J).  It is not true that the more ABA services the child receives the better.  Each child has

his/her own tolerance and fatigue level.

42.    Further, while a doctor may issue a prescription for 40 hours per week of ABA

Therapy, the doctor's prescription is for medical services, not early intervention.  Early

intervention services of that magnitude are not required or appropriate, in most cases.  Moreover,

the team that develops the IFSP is charged with providing services that are designed to meet the

developmental needs of children and the needs of families relating to their children's development.

See EIP Transition Guidance, Exhibit A.  The County is not required to optimize services.  Rather,

the County is charged with providing services at an appropriate level calculated to benefit the

child. Should a family want that many hours of any service, they can, in their discretion, supplement the offered early intervention services.

43. The Clinical Practice Guideline, Appendix B, EIP 22, Exhibit J, p. 68 summarizes: "The type, intensity, frequency, and duration of early intervention services provided to a child and family under NYS Early Intervention Program are determined through the IFSP process. All services in the IFSP must be agreed to by the parent and the Early Intervention Official. If disagreements arise about what should be included in the IFSP, parents can seek due process through mediation and/or an impartial hearing."

44. With respect to Preschool services, the school district of residence determines the types and frequency of services to be provided to Preschoolers, but does not identify specific methodologies for the services to be provided. The School District's CPSE develops the IEP, and the County then becomes responsible for contracting with the service providers who provide services and processing their vouchers for payments. The County's contract is for the amount of services recommended by the school district's CPSE. The County imposes no limits or restrictions, by policy or practice, about the amount of ABA Therapy services for which it will pay.

**Provider Affidavits**

45. I note that Susan Hatenboer's affidavit in support of Plaintiff's request for injunctive relief, sworn to on August 16, 2007, implies that she no longer services children through the County's Early Intervention Program. It is important for the Court to note that in September 2007, Ms. Hatenboer advised me that she would be working for Dynamic Therapy and Learning, an agency that contracts with the County to provide Early Intervention and Preschool Special Education services.

18

46.    Pamela DiPaolo's affidavit notes that she spoke with Jilly's Place and that they had an eight case load requirement and therefore she no longer provides services through the County. This eight case load requirement is not a County requirement and if any such requirement exists it is the agency's own requirement.

47.    Donna McGuire is a qualified special education teacher.  She has been a provider of services since approximately 1996, first as an independent contractor and then through an agency known as Bright Beginnings.  In her affidavit, Ms. McGuire makes reference to many situations and incidents without any specificity.  To the extent that there is no specificity or identification of the situations addressed, I am unable to respond to her allegations.

48.    In an attempt to paint me in an unfavorable light, Ms. McGuire has taken remarks out of context and has failed to provide the Court with complete information.  Autism has, and continues to be classified as a chronic disorder.  "There is no cure for autism.  Therapies and behavioral interventions are designed to remedy specific symptoms and can bring about substantial improvement."  Autism Fact Sheet: National Institute of Neurological Disorders and Stroke. (Exhibit K).  I fully subscribe to this philosophy and the EIP is geared to provide therapies and behavior interventions to work toward positive changes for the child and his/her family in accordance with this philosophy.

49.    Ms. McGuire's allegation that I terminated her contract is false.  I do not have the authority to issue or terminate a contract.  Only the County has that authority.

50.    In any case, Ms. McGuire makes a huge leap without any evidentiary support and assumes that the termination of contracts was designed to reduce ABA therapy services.  Not only is this assumption unsupported, but it is erroneous.  Moreover, the contracts at issue, including Ms. McGuire's were all reinstated.

51.    Ms. McGuire makes reference to an action that she has commenced against me. This action captioned *Donna McGuire v. Warren*, Docket No. O5-CIU2632 is pending before this Court. Initially, Ms. McGuire commenced this action against me and the County alleging claims under 42 U.S.C. § 1983 alleging that the termination of her contract was in retaliation of her engaging in protected speech in violation of the United States Constitution and the Due Process Clause of the Fourteenth Amendment and breach of contract. This Court dismissed plaintiff's complaint in its entirety. On appeal, the Second Circuit affirmed the dismissal of plaintiff's due process claims but held that she might be able to amend her complaint to state a viable claim for First Amendment retaliation. On remand, plaintiff moved for leave to serve an amended complaint. Leave to amend was granted and plaintiff's action alleging a single claim against me for First Amendment retaliation is now pending. Issue has been joined in that case.

52.    The tenor and tone of Ms. McGuire's affidavit must be considered in light of this history. Her failure to "name names" or provide details with regard to many of the incidents that she refers call into question the motive for her allegations, the context in which statements were made and the overall reliability of her affidavit in this application for mandatory injunctive relief.

53.    It is noteworthy that my overall relationship with service providers is very good and that we have always worked together to insure appropriate services for eligible children and their families. I know of no service providers that are intimidated by me or dissatisfied with my execution of my duties.

54.    I take this opportunity to remind Ms. McGuire and the Court that the EIP has an obligation to consider all relevant information and develop an IFSP that is appropriate for the child. The NYS Guidelines and physician recommendations assist in making decisions, but they

are not determinative. A multitude of factors must be given consideration to meet each child's unique needs.

55. Clearly, Ms. McGuire is unable to separate her personal animosity towards me and my responsibility and obligation to comply with the federal, state and local laws and rules that regulate the EIP and Preschool Program from her personal views and orientation.

**Mary Jo Whately**

56. Ms. Whately is a concerned grandparent who seeks to get the best possible services for her grandchild. In her quest to accomplish this worthy goal, she forgets that the EIP is a creature of statute that can only exist pursuant to its statutory mandate to provide appropriate services. S.W. was evaluated for her eligibility for services by evaluators chosen by her parents and her IFSP was developed with the IFSP team.

57. Certainly, as an attorney who has "represente[d] for children in the autistic spectrum here in Orange County" Ms. Whately is well aware of the procedures that a family must comply with if they are dissatisfied with the IFSP.

58. For all these reasons, I urge the Court to deny Plaintiffs' request for injunctive relief.

_Sheila Warren_
SHEILA WARREN

Sworn to before me this
16th day of October, 2007.

_Christine Saccone_
Notary Public

CHRISTINE SACCONE
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01SA6167645
QUALIFIED IN ORANGE COUNTY
COMMISSION EXPIRES JUNE 4, 20 11

21